## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HORACE LEE and IMRAN SANDOZI, on behalf of themselves and all others similarly situated, | ) ) |
| Plaintiffs, | ) **Case No.** 1:15-cv-11756 ) |
| v. | ) **Judge:** ) |
| UBER TECHNOLOGIES, INC. and RAISER, LLC, | ) **Magistrate Judge:** ) ) |
| Defendants. | ) ) |

## COMPLAINT AND JURY DEMAND

Plaintiffs Horace Lee and Imran Sandozi ("Plaintiffs"), on behalf of themselves and all other individuals who have worked or are currently working in Illinois as drivers for Defendants Uber Technologies, Inc. and Raiser, LLC (collectively, "Uber"), allege the following:

### INTRODUCTION

1.      This case is about thousands of hard-working drivers struggling to get by while Uber, a company valued at more than *$50 billion*, exploits them to bolster its bottom line. Though it likes to call itself a technology company, Uber is a transportation company. Uber does not sell software; it sells rides. Nonetheless, to increase profits, Uber uses its position of power to mislead and take advantage of its drivers at every turn.

2.      Uber refuses to pay for its expenses and foists all expenses onto its employees. The result is that its drivers cannot earn minimum wage, but less a living wage. Moreover, to further squeeze profits from what should be expenses, Uber routinely misappropriates money from their fares and shirks its financial commitments.

3.      Uber falsifies the employment status of its drivers.  Though Uber exercises near complete control over its drivers, and many of its drivers work the equivalent of two full-time jobs for Uber, it classifies drivers as "independent contractors," rather than "employees."

4.      Uber misrepresents how drivers are paid so that it can retain a larger percentage of the fares that they generate.  Uber tells customers that gratuity is included in the fares charged when they use Uber's electronic payment service.  In reality, however, Uber fails to remit the gratuity to its drivers.

5.      Plaintiffs bring this action to prevent Uber from continuing to ride roughshod over its drivers' contractual and statutory rights and to return to Uber's drivers what is rightfully theirs – what they earned.

6.      Accordingly, Plaintiffs seek to recover damages for Uber's numerous violations of the Illinois Compiled Statutes for its: (a) failure to provide prompt payment of wages to drivers upon termination and resignation in violation of 820 ILCS 115/5; (2) misclassification of its employees as independent contractors in violation of 820 ILCS 185; (3) failure to keep required payroll records in violation of 820 ILCS 105/8; and (4) failure to pay minimum wages in violation of 820 ILCS 105.

7.      Plaintiff also seeks to recover damages for Uber's many common-law violations: (a) tortious interference with prospective business relations; (b) breach of contract; (c) promissory estoppel; (d) unjust enrichment; (e) conversion; (f) unfair competition; and (g) fraud.

## PARTIES

8.      Plaintiff HORACE LEE is a citizen of the State of Illinois and a resident of Cook County.

9.      Plaintiff IMRAN SANDOZI is citizen of the State of Illinois and a resident of Cook County.

10.     Uber Technologies, Inc. is a Delaware corporation headquartered in San Francisco, California. Uber Technologies, Inc. is authorized to conduct business and does conduct business throughout Illinois, including in Cook County.

11.     Raiser, LLC, a Delaware limited liability company, is a subsidiary of Uber Technologies, Inc. and is its equivalent for purposes of this action.  It is authorized to conduct business and does conduct business throughout Illinois, including in Cook County.

12.     At all relevant times, Uber was an "employer" within the meaning of all applicable statutes.

13.     At all relevant times, the work performed by Plaintiff and similarly situated employees was directly essential to the business operated by Defendants.

### JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over the controversy pursuant to 28 U.S.C. § 1332(a) because Plaintiffs are residents of the State of Illinois and Defendants are foreign corporations incorporated in the State of Delaware with principal offices in the State of California. The amount in controversy exceeds $75,000.

15.     Venue is proper in the Northern District pursuant to 28 U.S.C. § 1391 as the events and conduct giving rise to the claims occurred in this District.

### STATEMENT OF FACTS

**A.      Plaintiffs Horace Lee and Imran Sandozi**

16.     In 2015, Plaintiff Horace Lee began working for Uber as an UberX driver. Plaintiff continues to work as a driver for Uber.

17.     On average, Plaintiff drives between three (3) and twenty-five (25) hours per week.

18.     In August of 2013, Plaintiff Imran Sandozi began working for Uber as an UberX driver.  Plaintiff continues to work as a driver for Uber.

19.     On average, Plaintiff drives between twenty-five (25) and thirty (30) hours per week.

20.     Uber compensates its drivers weekly.  Uber takes 20% of the total fares and the driver receives the remaining 80%.

21.     Depending on the number of hours driven per week, Plaintiff Lee was compensated between $15-$400 per week and incurred approximately $50 per week in expenses, including gas, tolls, lease payments, and car repairs.

22.     Plaintiff Sandozi was compensated between $300-$350 per week and incurred $100-$200 per week in expenses, including gas, tolls, lease payments and car repairs.

23.     At all times, Plaintiffs paid for their own expenses including gas, tolls, lease payments and car repairs.

24.     On December 11, 2015, Defendant attempted to circulate a new Technology Services Agreement to its drivers.

25.     On December 21, 2015, Plaintiff Sandozi opted out of Uber's arbitration agreement by sending an email to optout@uber.com as per the agreement.

26.     On December 22, 2015, Plaintiff Lee opted out of Uber's arbitration agreement by sending an email to optout@uber.com as per the agreement.

**B.     Uber Increases its Profits by Deceiving its Drivers**

27.     Uber routinely misappropriates money from its drivers' fares.  Specifically, Uber deducts a $1 "safe ride" fee from each fare, which is allegedly used to pay for background checks, driver safety education, and development of safety features in its mobile application—an expense that Uber, the employer, should pay.

28.     Uber routinely fails to honor its financial commitments to its drivers.  For example, Uber's contract provides that drivers must be compensated $6.00 for cancelled fares, but Uber failed to compensate Plaintiffs for a majority of cancelled fares. Uber also told Plaintiffs that they would receive a credit card that would entitle him to a discount for fuel once they completed 20 rides; however, no card was ever provided.

29.     Uber routinely misleads its drivers regarding the amount of money that they can earn. For example, Uber told Plaintiffs that drivers can earn guaranteed money working at a certain time. However, Plaintiffs did not earn the guaranteed hourly pay (over $20 per hour) that Uber promised its drivers could earn.

**C.      Uber Increases its Profits by Misappropriating its Drivers' Tips.**

30.     During the course of their employment, Plaintiffs did not receive gratuities.

31.     Uber told customers, on its website and in marketing materials, that gratuity is included in the total cost of the fare for the car service and that there is no need to tip the driver.

32.     Uber intentionally misrepresented to customers that gratuity was included in the cost of its fares and thus instructed passengers not to leave a tip in addition to the amount of the fare.

33.     Uber also misrepresented to Plaintiffs, via its training video, that tips would be added to their wages.  Uber told Plaintiffs not to ask for or accept tips because passengers would

tip based on service by selecting a percentage on the Uber application, then the tips would be passed on to the drivers.

34.     Plaintiffs were further instructed that if a passenger offers a gratuity, they are to refuse it, which they do.

35.     Despite Uber's misrepresentations to customers that "there's no need to tip" and its misrepresentations to Plaintiffs and other drivers that tips would be added to their wages, Plaintiffs and other drivers did not receive their gratuities.

36.     As a result of Uber's misrepresentations to customers that gratuity is included in the cost of its service and there is no need to tip drivers, Plaintiffs and other Uber drivers have been deprived of payments to which they are entitled.

**D.     Uber Increases its Profits by Misclassifying its Drivers as Independent Contractors.**

37.     Uber uniformly misclassifies its drivers, including Plaintiffs, as independent contractors when they are employees.

38.     Uber is deeply involved in marketing its transportation services, qualifying and selecting drivers, regulating and monitoring drivers' performance (including disciplining or terminating those who fail to meet standards), and setting prices.

39.     Uber exercises substantial control over the qualification and selection of its drivers.  Before working for Uber, applicants must first complete Uber's application process, including a background check, city knowledge exam, vehicle inspection, and personal interview.

40.     Uber exercises considerable control and supervision over the work details of its drivers - the manner, methods, and means of its drivers' provision of transportation services.  For example, upon signing an agreement to work for Uber, new drivers must watch a video demonstrating how Uber wants them to interact with customers.  Drivers are even instructed on

such simple tasks as how to pick up a customer with their car. In short, Uber retains all necessary control over its drivers' performance.

41.      Uber controls the instrumentalities of Plaintiff's job. For example, drivers cannot use a car that is more than ten (10) years old and Uber controls its drivers' car registrations.

42.      Uber monitors its drivers to ensure compliance with Uber's quality control standards. All drivers for Uber, including Plaintiffs, must maintain an average customer star evaluation of at least 4.5 out of a possible 5 stars. Instructions on how to improve one's star rating are given to drivers who fall below this average in any given week. If a driver fails to maintain an average customer rating of 4.5, Uber deactivates the driver's ability to use the application to pick up customers, an action tantamount to terminating the driver "at will," a hallmark of an employee-employer relationship. Thus, monitoring through rider ratings is an effective mechanism for Uber to enforce its standards.

43.      Uber also unilaterally sets the fares - with no negotiation or input from drivers - for all rides, and drivers are required to charge the cost determined solely by Uber. Uber then bills customers for the entire amount before remitting a portion of the fare to its drivers. Uber pays its drivers weekly.

44.      Uber claims a proprietary interest in its riders, which further demonstrates that Uber acts as more than a mere intermediary between riders and drivers. For instance, Uber prohibits its drivers from answering rider queries about booking future rides outside the Uber application or otherwise soliciting Uber riders.

45.      As a result of the intentional misclassification of its employees, Uber failed to provide Plaintiffs and other similarly aggrieved driver employees with itemized wage statements, minimum wages, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and

lease payments). Uber also failed to keep accurate payroll records evidencing Plaintiffs' and other drivers' hours worked and wages paid and unlawfully retained gratuities owed to Plaintiffs and other drivers, despite representing to customers and its drivers that gratuity is included in the total cost of the service.

## CLASS ALLEGATIONS

46.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all other similarly situated individuals, as defined:

> All individuals who have worked or are currently working for Uber as
drivers                          within the State of Illinois.

47.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Excluded from the Class are Defendants and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

48.     This action is properly maintainable as a class action. The proposed Class is so numerous that joinder of all members is impracticable.

49.     Plaintiffs are members of the Class they seek to represent.

50.     There are questions of law or fact common to the Class, which predominate over any questions affecting only individual members. Among the questions of law and fact common to the class include but are not limited to:

a.      Whether Defendants have charged customers a gratuity for class members' services;

b.      Whether Defendants failed to distribute the total proceeds of those gratuities to the class members;

c.      Whether Defendants have informed customers that gratuity is included in the price of the Uber service and so there is no need to tip the drivers;

d.      Whether class members have suffered damages based upon Uber's representation to customers that there is no need to tip the drivers;

e.      Whether Defendants improperly classified class members as independent contractors rather than employees;

f.      Whether class members have been required to pay the expenses of their employment, including the cost of a vehicle, repairs, gas and tolls;

g.      Whether Uber unlawfully denied compensation to Class members; and

h.      Whether Class members were denied employee benefits as required by law.

51.     The representative Plaintiffs can adequately represent the Class. No conflict of interest exists between the representatives and the Class members or with respect to the claims for relief requested.

52.     The claims of the proposed lead Plaintiff are typical of those of the proposed Class because they are based on the same legal theories and arise out of the same business practices and course of conduct by Uber.

53.     The proposed lead Plaintiffs and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution. In addition, the representative's attorneys

are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class. Furthermore, the resources available to counsel ensure that the litigation will not be hampered by a lack of financial capacity. Plaintiffs' attorneys have sufficient financial resources and are willing to absorb the costs of the litigation.

54.     The proposed class action is the surest way to fairly and expeditiously compensate so large a number of injured persons; to keep the courts from becoming paralyzed by hundreds, perhaps thousands of repetitive cases, and to reduce transaction costs so that the injured Class can obtain the most compensation possible, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation.

55.     Class certification is also appropriate pursuant to Rule 23 because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The Class members have been damaged and are entitled to recovery as a result of Defendants' common and discriminatory policies and practices.

## COUNT I
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

56.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

57.     Defendants' website sets forth:

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file — there's no need to tip.

58.     In reality, Uber collected gratuities and failed to remit them to the drivers.

59.     Based on past practices of failing to remit gratuities, Uber knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to the drivers.

60.     Defendants' conduct, in failing to remit the total proceeds of gratuities to drivers constitutes unlawful tortious interference with the contractual and/or advantageous relationship that exists between the drivers and customers, under state common law.

61.     Defendants' conduct, informing customers "there is no need to tip" constitutes unlawful tortious interference with the contractual and/or advantageous relationship that exists between the drivers and customers, under state common law.

62.     Were it not for Uber's misrepresentations regarding gratuities, riders would have left a tip for drivers as is customary in the car-service industry.

63.     Uber's conduct caused damage to Plaintiffs and other drivers.

**COUNT II**
**BREACH OF CONTRACT**

64.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

65.     Defendants' conduct constitutes a breach of contract under state common law. Defendants have an implied contract with Plaintiffs and the drivers to remit to them the total proceeds of all gratuities.

66.     Plaintiffs and other drivers are third-party beneficiaries of customers' implied contract with Uber that tips would be remitted to drivers, the terms of which were incorporated by reference from certain advertisements or statements Uber made on various webpages.  By entering into this agreement, customers intended to secure a financial benefit for drivers, including Plaintiffs, in the form of gratuity and to act directly for the drivers' benefit.

67.     Uber withheld and continues to withhold gratuities given by customers to Uber drivers and/or gratuities that are incorporated into the set fare.

68.     Uber contracted with Plaintiffs and other drivers to pay surge fares, to provide a credit card entitling drivers to a discount on gas, and to pay $6.00 for cancelled fares.

69.     Uber has failed to pay surge fares, to provide a credit card entitling drivers to a discount on gas, and to pay $5.00 for cancelled fares.

70.     Uber's conduct damaged Plaintiff and other drivers.

**COUNT III**
**UNJUST ENRICHMENT**

71.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

72.     Defendants unlawfully retained gratuities and surge fares promised to Plaintiff and other drivers and did not reimburse expenses.

73.     Uber obtained these benefits from Plaintiffs and drivers by making material misrepresentations and taking advantage of them.

74.     As a result, Defendants have been unjustly enriched.

75.     Uber's conduct damaged Plaintiffs and other drivers.

76.     Plaintiffs and the class members are entitled to restitution for their full share of the proceeds of the improperly retained gratuities and employment related expenses.

**COUNT IV**
**CONVERSION**

77.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

78.     Plaintiffs and other drivers had the right to possession of tips, surge fares, cancellation fees, and money spent for expenses.

79.     Uber interfered with Plaintiffs and the other drivers' right to their property by refusing to relinquish the property to them. Instead, Uber retained the property for its own benefit.

80.     The converted property was personal.  For example, tips were specifically earmarked for Plaintiffs and other drivers.

81.     Uber's conduct damaged Plaintiff and other drivers. Plaintiffs were harmed and class members are entitled to restitution for their full share of proceeds, as well as treble damages.

**COUNT V**
**UNFAIR COMPETITION**

82.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

83.     Defendants' activities have caused confusion with, or have been mistaken for, Plaintiffs' activities in the mind of the public, or are likely to cause such confusion or mistake; or Defendants have acted unfairly in the State of Illinois in some manner.

84.     Plaintiffs' property rights, specifically gratuities, cancellation fees, surge fares and expenses, were misappropriated by Defendants for their commercial advantage.

85.     Defendants' conduct damaged Plaintiffs and other drivers.

**COUNT VI**
**FRAUD AND MISREPRESENTATION**

86.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

87.     Defendants made material representations of fact, that the Plaintiffs would receive gratuities, surge fares and cancellation fees.

88.     These misrepresentations were material because they affected Plaintiff and other drivers' decisions to continue driving for Uber.

89.     Uber knew at the time it made these misrepresentations—or, at the very least, made the misrepresentations recklessly—that it would not pass along these monies to Plaintiffs and other drivers based on its past practices of not doing so.

90.     Plaintiffs and other drivers reasonably and justifiably relied on these misrepresentations and continued to drive for Uber because Uber was their employer and the party responsible for overseeing the payment of these monies.

91.     Uber's conduct damaged Plaintiff and other drivers.

## COUNT VII
## VIOLATIONS OF THE STATE OF ILLINOIS LABOR LAW

92.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

93.     Despite the existence of an agreement indicating Plaintiff is an independent contractor, the treatment of Plaintiff and control exercised by Uber indicate that Plaintiff is an employee.

94.     Accordingly, Uber's actions violate the Illinois Compiled Statutes ("ICS"). Plaintiffs seeks damages violations of the following sections of the ICS:

a. failure to provide prompt payment of wages to driver employees upon termination and resignation in violation of 820 ILCS 115/5;

b. failure to keep required payroll records in violation of 820 ILCS 105/8;

c. failure to pay minimum wages in violation of 820 ILCS 105 *et seq.*; and

d.misclassification of its employees as independent contractors in violation of 820 ILCS 185.

95.     As a result of Uber's violations, Plaintiffs are entitled to recover reasonable attorneys' fees and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid pursuant to 820 ILCS 105/12, 820 ILCS 105/14 and 820 ILCS 185.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs individually and on behalf of the proposed class, requests relief against the Defendants as follows:

a.   An award of damages, including compensatory, punitive, treble damages, liquidated damages and back pay,  in an amount to be determined at trial;

b.   Notice to the Class of the action;

c.   An injunction against Defendants prohibiting Defendants from engaging in each of the unlawful practices, policies and patterns set forth herein;

d.   Reasonable attorneys' fees and costs of this action;

e.   Pre-judgment and post-judgment interest as provided by law; and

f.   An Order requiring that Defendants return to Plaintiffs any gratuities and any other funds wrongfully kept by Defendants;

g.   Such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and the proposed class, demands a trial by jury on all claims so triable.

Dated: Edwardsville, Illinois

December 29, 2015

Respectfully submitted,

NAPOLI SHKOLNIK, PLLC

*/s/ Eric Jackstadt*

_____

Eric Jackstadt
103 West Vandalia Street, Suite 125
Edwardsville, IL 62025
(212) 397-1000

IMBESI LAW P.C.

*/s/ Brittany Weiner*

_____

Brittany Weiner (pro hac vice pending)
450 Seventh Avenue, Suite 1408
New York, NY 10123
(212) 736-0007 (Phone)
(212) 658-9177 (Fax)

*Attorneys for Plaintiff*

--

OSTOJIC & SCUDDER, LLC

*/s/ John Ostojic*

_____

John Ostojic
Donald Gallagher
332 South Michigan Avenue, Ste. 1000
Chicago, IL 60604
(312) 913-0860 (Phone)
(312) 913-0868 (Fax)

*Local Counsel*

16